# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

CENTER FOR IMMIGRATION STUDIES, INC.

    *Petitioner*,

    v.

U.S. DEPARTMENT OF JUSTICE, U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA

    *Respondent*.

No. _____

**CENTER FOR IMMIGRATION STUDIES' PETITION TO MODIFY OR SET ASIDE CIVIL INVESTIGATIVE DEMAND AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

## INTRODUCTION AND PETITION

"***Go get the money.***" That's what SBA—the agency charged with administering the Paycheck Protection Program—wrote in response to the Center for Immigration Studies ("CIS") stating it was a "think tank" and asking about its eligibility for a Second Draw Loan. CIS attached that email exchange to its loan application. And CIS provided SBA with yet more documents identifying itself as a "non-profit research organization" "providing immigration policymakers … with reliable information." Fully apprised of these facts, SBA determined CIS was eligible for the loan, and nothing suggests SBA has changed its position.

After DOJ issued a contact letter claiming it was investigating CIS for falsely certifying CIS's eligibility on its loan application, DOJ conceded it was unaware of those documents. DOJ hadn't bothered to look at CIS's application as part of its "investigation" before demanding "resolution" on the basis of false certification. When those documents were brought to DOJ's attention, DOJ refused to acknowledge cases holding that government knowledge precludes FCA liability. Rather, DOJ claimed "it's on the applicant to confirm their eligibility," "CIS was either eligible or it was not."

That's an eligibility or contract dispute, not a basis for False Claims Act ("FCA") liability, and they are beyond DOJ's FCA jurisdiction. But when CIS pointed out DOJ's error—CIS had disclosed the relevant facts as part of CIS's application, such that CIS would be entitled to judgment on the pleadings on any FCA claim—DOJ reached into the *Godfather's* playbook: despite its FCA claims being foreclosed, DOJ continued demanding repayment of twice CIS's loan, and asserted that absent resolution it would issue a CID. DOJ did just that when CIS refused to repay twice the loan amount for a meritless claim. DOJ made clear, however, that much of its overbroad and burdensome CID is directed to CIS's *eligibility*, not the truth or falsity of CIS's certification. Again, that's not a false claim; it's outside of DOJ's CID authority; and using a burdensome FCA CID to obtain leverage on a non-FCA claim is an improper purpose. CIS petitions for the CID to be set aside. 31 U.S.C. § 3733(j)(2).

## BACKGROUND

### The Paycheck Protection Program

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116–136, § 1102, 134 Stat. 281, 286-94, to provide assistance to persons affected by the pandemic. As relevant here, Section 1102 of the CARES Act temporarily permitted the Small Business Administration ("SBA") to guarantee loans under a new program—titled the "Paycheck Protection Program" or "PPP"—pursuant to section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)). Section 1106 of the CARES Act also provided for forgiveness of qualifying PPP loans. Speed was key. In a March 31, 2020 press release, SBA Administrator Jovita Carranza described the PPP:

> "This unprecedented public-private partnership is going to assist small businesses with accessing capital quickly. Our goal is to position lenders as the single point-of-contact for small businesses – the application, loan processing, and disbursement of funds will all be administered at the community level," said Administrator Carranza. "**Speed is the operative word**; applications for the emergency capital can begin as early as this week, with lenders using their own systems and processes to make these loans.

Exh. 1.

The Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid Act" or "EAA"), Pub. L. 116–260, 134 Stat. 1993 (2020), followed. Section 311 of the EAA added a new temporary section 7(a)(37) to the Small Business Act (15 U.S.C. 636(a)(37)). This new section authorized SBA to guarantee so-called Second Draw Loans, generally under the same terms and conditions as the original PPP. But the definition of "eligible entity" in the EAA differed. It excluded:

> any business concern or entity primarily engaged in political or lobbying activities, which shall include any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents;

134 Stat. at 2002.

2

On January 14, 2021, SBA issued an Interim Final Rule addressing PPP eligibility. Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3,692 (Jan. 14, 2021). In its IFR, SBA recognized it had issued a bewildering array of statements about eligibility, and the agency itself was struggling to sort through the mess. *See* 86 Fed. Reg. at 3,693. Further complicating things, SBA acknowledged that lending decisions required consideration of legal issues beyond the CARES Act and EAA, "including the First Amendment to the Constitution," 86 Fed. Reg. at 3,711.[1] SBA again made clear, however, that its overarching concern was speed: it dispensed with loan-specific authorizations "in order to ensure that critical PPP loans are disbursed as efficiently as practicable." 86 Fed. Reg. at 3,709.

On the same day, SBA issued a separate Interim Final Rule addressing Second Draw PPP Loans. Business Loan Program Temporary Changes; Paycheck Protection Program Second Draw Loans, 86 Fed. Reg. 3,712 (Jan. 14, 2021). The Second Draw IFR explained that "Second Draw PPP Loans generally are guaranteed by SBA under the same terms, conditions, and processes as First Draw PPP Loans," and "are subject to SBA's and the Department of the Treasury's (Treasury's) consolidated interim final rules implementing updates … for First Draw PPP Loans" "except as specified in this IFR." 86 Fed. Reg. at 3,713. As relevant here, SBA elaborated on the statutory language with respect to the lobbying ban, specifying the following in the operative regulation for ineligibility:

> [A] business concern or entity primarily engaged in political activities or lobbying activities, as defined in section 3 of the Lobbying Disclosure Act of 1995 (2 U.S.C. 1602), including any entity that is organized for research or for engaging in advocacy

---

[1] Congress can set "conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize," but the First Amendment forbids "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Alliance for Open Society, Int'l, Inc. v. U.S.A.I.D.*, 570 U.S. 205, 214-16 (2013). Thus, for example, Congress could not condition participation in a spending program on a citizen yielding its First Amendment rights once it is no longer receiving government funds. *See Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014).

in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents[.]

86 Fed. Reg. at 3,718-19. SBA also made clear that "like First Draw PPP Loans, Second Draw PPP Loans are intended to provide expeditious relief …" *Id.* at 3,712-13.

### CIS's Second Draw PPP Loan: "Go ahead and take the money"

Like many organizations, CIS was interested in obtaining a Second Draw PPP Loan. To that end, on March 1, 2021, CIS Director of Finance Bill Ostrye emailed Chris Northrup, his contact at CIS's bank. Ostyre stated he was uncertain about the required certification of CIS's eligibility. Exh. 2. He explained that CIS is "the nation's only think tank devoted exclusively to the research of U.S. immigration policy," but "[w]e are not involved in political or lobbying activities." *Id.* Ostrye then asked "if the … certification is related only to for profit entities or think tanks involved in political or lobbying activities?" *Id.* "I've tried to research this, but haven't been able to find any clear explanation." *Id.* Northrup responded:

> Unfortunately, they have asked us not to interpret these types of language and let the organization decide whether or not to apply. The good news is the ***SBA is reviewing this round of loans so it would have to go through them to make a determination on whether or not you are eligible. I would also think the language that states "primarily engaged" would help your case.***
>
> I apologize I can't give you a black and white, "yes or no." I hope this is somewhat helpful as you make a decision to apply or to hold back.

Exh. 2 (emphasis added).

Still seeking clarification, Ostyre then emailed SBA employee Roderick Johnson, an SBA "subject matter expert … for the Paycheck Protection Program," Exh. 3:

> We are very interested in applying for a 2nd Draw PPP loan, however, we are looking for clarification of the Certification included on the Second Draw Borrower Application Form, Revised March 18, 2021, page 4,
>
> "The Applicant is not a business concern or entity primarily engaged in political or lobbying activities, including any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents."

> Is this Certification addressing political or lobbying activities overall and the underlying entities/Think Tanks that provide research or advocacy in areas such as public policy or political strategy within political or lobbying activities, or is it addressing, entities primarily engaged in political or lobbying activities, AND entities that are organized for research, AND for engaging in advocacy in areas such as public policy or political strategy, AND Think Tanks?
>
> We are an independent, non-partisan, 501(c)(3) non-profit, research organization. ***We are the nation's only think tank devoted exclusively to the research of U.S. immigration policy*** to inform policymakers and the public about immigration's far-reaching impact.
>
> We are not involved in political or lobbying activities.

Exh. 4 at Addendum B (emphasis added). Mr. Johnson, a PPP expert at SBA, responded:

> ***Go get the money*** but first you must use all the first draw money before getting the second draw and ***if you are not doing political lobbying you should be fine***.

*Id.* (emphasis added).

Thereafter, on March 31, 2021, CIS Executive Director Mark Krikorian executed a "Paycheck Protection Program Second Draw Borrower Application Form Revised March 18, 2021." *Id.* ("Application"). The application included a series of statements that "[t]he authorized representative of the Applicant must certify in good faith to … by initialing next to each one." *Id.* Among the statements was the one Ostyre had inquired about: "The Applicant is not a business concern or entity primarily engaged in political or lobbying activities, including any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents." Krikorian initialed next to that statement, and added "(See Addendum B)".

Addendum B included a "Certification Clarification" stating:

> We reached out to Roderick Johnson, Lender Relations Specialist, with the SBA (email below) and received confirmation of our eligibility as it relates to the following Certification on page 4 of the Second Draw Borrower Application Form, Revised March 18, 2021:

"The Applicant is not a business concern or entity primarily engaged in political or lobbying activities, including any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents."

Exh. 4 at Addendum B. A copy of the email exchange between Mr. Ostrye and Mr. Johnson—including CIS's disclosure that it is a think tank—followed that statement, *i.e.*, it was attached to CIS's loan application. *Id.* Consistent with United Bank's representation that SBA would review CIS's eligibility, the last line of the addendum stated: "If Center for Immigration Studies, Inc. should be classified as an ineligible entity, as described in the above Certification, please disregard our Application." *Id.*

The following day, Mr. Northrup of United Bank emailed Ostrye:

There is a hold by the SBA on the 2nd PPP submission due to the NAICS code coming up and saying the organizations is a lobbying group. Can you please provide one of the below documents so we can get this cleared for you:

**"Eligibility – Lobbying** - Borrower appears to be a Lobbyist - Potential eligibility issue"

**Please provide proof that the borrower is not involved in lobbying such as:**
a. CPA reviewed financial statements
b. Tax return
c. Borrower disclosure of sources/amounts of revenue

Exh. 5 (bold in original). After a brief exchange about NAICS codes, Mr. Northrup responded "I know it is a pain, but I would advise we just give the SBA what they want to get this hold removed." *Id.* Mr. Ostrye provided CIS's 2019 Form 990. *Id.* The Form 990 described CIS's "mission or most significant activities" as follows: "The Center for Immigration Studies is an independent, non-partisan, non-profit research organization." Exh. 6. "Since our founding in 1985, we have pursued a single mission – providing immigration policymakers, the academic community, news media, and concerned citizens with reliable information about the social, economic environmental, security, and fiscal consequences of legal and illegal immigration into the United States." *Id.* Elsewhere on the same Form 990, CIS similarly identified its mission as "research and publication of immigration issues." *Id.*

SBA was satisfied with the result of its inquiry. Thereafter, CIS Executive Director Mark Krikorian executed a "Commercial Promissory Note and Business Loan Agreement" for $366,160.00 with United Bank in connection with SBA Loan Number # 3393108806. Exh. 7 ("Agreement"). CIS complied with the terms of its loan agreement, and the debt was forgiven pursuant to the terms of the PPP. To CIS's knowledge, SBA has not reversed its determination that CIS was eligible for a Second Draw Loan, and SBA has not reversed its determination that CIS was eligible for forgiveness of that loan.

### DOJ Responds to the President's and Congress's Ire

In May 2021, Attorney General Garland established a "COVID-19 Fraud Enforcement Task Force" to "marshal the resources of the Department of Justice in partnership with agencies across government to enhance efforts to combat and prevent pandemic-related fraud." Exh.10. That – and the "more than 1,000 criminal cases" initiated by the COVID-19 Fraud Enforcement Task Force weren't enough for President Biden, who announced "the Department of Justice will escalate our efforts to crack down on bad actors" in COVID-related loan programs. Exh. 11. Congress began bombarding Attorney General Garland with letters regarding those efforts, *e.g.*, Exh. 12, and holding hearings on PPP fraud.[2] DOJ is now doing as its political masters desired. Among the targeted entities are non-profit organizations that have identified themselves as "think tanks," which DOJ aggressively pursues on the basis of FCA. *Compare* Exhs. 12 and 13 *with* Exh. 14 and 15.

### DOJ's Contact with CIS

In late February 2024, DOJ sent a contact letter to CIS stating "this Office is investigating whether CIS falsely certified in its second draw loan application that it was 'not a business concern or entity primarily engaged in political or lobbying activities, including any entity that is organized for

---

[2] https://oversight.house.gov/hearing/federal-pandemic-spending-a-prescription-for-waste-fraud-and-abuse/

research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents.'" Exh. 7. CIS retained counsel and reached out to DOJ.

In March, CIS's counsel had an initial telephone conference with the DOJ attorney designated as the FCA investigator. St. John Decl. ¶ 9. The FCA investigator explained "[t]he government is looking at PPP funds that went out the door that shouldn't have," and he noted "there's lots of news about that." *Id.* He then stated that "[t]hrough publicly available information [CIS] was identified as an entity that did seek a Second Draw Loan … but [it] appears based on publicly available information—Form 990 filed with the IRS, [CIS's] website, etcetera—that [CIS] seems to fit that definition of an entity that's not eligible." *Id.* He then wanted to talk about "[r]esolution … without the need for litigation or further expense for something that is less than what the False Claims Act provides" and insisted "CIS was not eligible for these funds." *Id.*

CIS's counsel inquired if DOJ had looked at CIS' certification. St. John Decl. ¶ 10. The response was telling: "I don't know if I've personally seen … it was a check box. There was a list of check boxes." *Id.* At that point, CIS's counsel explained that CIS had reached out to the SBA, identified itself as a think tank, and inquired about its eligibility. CIS's counsel further explained that CIS received an email back from SBA telling it to move forward with the application, and CIS "attached all of that to their certification." *Id.* Seeking to resolve the matter out of court, CIS's counsel further explained that these events destroy scienter, and the government knowledge defense would also foreclose liability because CIS told the government it was a think tank and even included that information with its loan application. *Id.* The FCA investigator reemphasized that "we're going off of publicly available information," and he needed to consult with other DOJ staff. Following that call, CIS emailed the DOJ false claims investigator its Second Draw loan application, including the

addendum with the email in which CIS disclosed it was a think tank and SBA responded "get the money." *See* Exh. 15.

On April 2, CIS's counsel had another telephone conference with the FCA investigator. St. John Decl. ¶ 12. He acknowledged that "CIS did reach out to SBA," but claimed SBA "didn't say one way or another whether CIS was eligible," "it's on the applicant to confirm their eligibility," and "the question then becomes is CIS eligible for the Second Draw PPP loan or not." *Id.* CIS's attorney reiterated that that could not be a False Claims Act theory because of CIS's disclosures. *Id.* The investigator, in turn, reiterated that based on "publicly available information—website … Form 990, it looks to us that [CIS] was engaged in the kind of activities that were excluded from the program because it was engaged in this kind of public policy research and advocacy." *Id.* He pointed to a settlement in which a nonprofit paid back the loan proceeds plus interest, but stated "the position of our office is that doesn't fully make the government whole." The investigator acknowledged that he "certainly didn't have [CIS's] email" with SBA before, but DOJ did not "believe this email materially changes the government's position that CIS was not eligible." St. John Decl. ¶ 13. He refused to even acknowledge the existence of a government knowledge defense as a concept, and stated that "[i]f CIS would like to resolve this without having to go through an investigation, litigation, stuff like that" it should propose a settlement. *Id.* CIS memorialized that conversation in an April 19, 2024, email, that included multiple D.C. Circuit cases discussing how disclosure to the government negates FCA liability. Exh. 16.

In an April 30 call, the FCA investigator again repeated that "our office is taking a look at think tanks" in connection with Second Draw loans, and reiterated that "if a mutually agreeable resolution is not apparent" DOJ would serve a CID. St. John Decl. ¶ 15. When asked about the authorities cited in the email, the investigator blithely remarked that "[s]cienter is a factual issue." *Id.* CIS's counse similarly reiterated that it's not just a scienter issue, "it's a government knowledge issue,"

and expressed concern that DOJ is acting under political pressure and "taking the position that … [it] can do whatever [it] want[s]." When asked to make an offer, the investigator stated "with respect to these PPP loan cases … our office is willing to settle it for two times the original loan amount." *Id.* CIS made clear that it would consider repayment of the loan if it was not actually eligible, but it was unwilling to repay a multiple when it had acted in good faith by inquiring about its eligibility. *Id.* The FCA investigator responded that he would need to "consult with folks … and see where our office is." *Id.* In a subsequent call, DOJ maintained its demand for repayment of twice the loan amount, stating that the "[f]acts would seem to suggest CIS is not eligible." St. John Decl. ¶ 16.

THE CIVIL INVESTIGATIVE DEMAND

In July, the FCA investigator emailed CIS's counsel a CID and asked if CIS's counsel would accept service. Exh. 17. The FCA investigator thereafter sought to condition an extended response period on CIS not challenging the CID, a term that was unacceptable to CIS and which CIS did not accept. *Id.* Having heard nothing more, CIS's counsel received an email on September 24 in which the FCA investigator threatened to "petition the Court for an order compelling compliance and seek fees to recoup the cost of seeking compliance," albeit without identifying any authority for awarding fees in enforcing a non-self-executing CID. *Id.* Thereafter, CIS received a CID on or about October 8. Exh. 8. CIS asked for a meet-and-confer, but the FCA investigator refused in a lengthy written response. Exh. 18.

**JURISDICTION**

This Court has jurisdiction over CIS's petition pursuant to 31 U.S.C. § 3733(j)(2) because CIS resides in this judicial district.

**LEGAL STANDARDS**

When "the Attorney General, or a designee … has reason to believe that any person may be in possession, custody, or control of any documentary material or information relevant to a false claims

10

law investigation, the Attorney General, or a designee, may … issue in writing and cause to be served upon such person, a civil investigative demand requiring such person (A) to produce such documentary material for inspection and copying, [or] (B) to answer in writing written interrogatories with respect to such documentary material or information," subject to requirements for definiteness, certainty, and "a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying." 31 U.S.C. § 3733. The CID "may not require the production of any documentary material, the submission of any answers to written interrogatories, or the giving of any oral testimony if such material, answers, or testimony would be protected from disclosure under…the standards applicable to discovery requests under the Federal Rules of Civil Procedure." *Id.*

At a minimum, "the Fourth Amendment requires that the [CID] be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *SEC v. Covington & Burling, LLP*, 2023 U.S. Dist. LEXIS 127205, at *15 (D.D.C. July 24, 2023) (quoting *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1024 (D.C. Cir. 1978)).[3] Accordingly and ordinarily, to be able to enforce a CID, the agency must show "[1] that the investigation will be

---

[3] Constitutional jurisprudence has changed substantially over the years, as the *Covington* subpoena recipient urged. CIS preserves the argument that *Arthur Young* and its underlying cases are no longer good law, and that the CID is subject to far more robust Fourth and Fifth Amendment requirements. For example, the Supreme Court has rejected the argument that a subpoena did "not involve the direct taking of evidence" and hence did not implicate the Fourth Amendment's warrant requirement. *Carpenter v. United States*, 585 U.S. 296, 317-18 (2018). The Court has also been sensitive to technological changes, *Kyllo v. United States*, 533 U.S. 27 (2001), including the volume of information retained in digital form, *Riley v. California*, 573 U.S. 373, 403 (2014). And while a reasonable expectation of privacy is still sufficient to trigger Fourth Amendment protection, the Court clarified that is in addition to the historic protections derived from Founding Era opposition to general warrants and "concern for government trespass upon" "persons, houses, papers, and effects." *United States v. Jones*, 565 U.S. 400, 406-07, 409 (2004). Indeed, the Court has made clear that our system arises from a rejection of "the process of the ecclesiastical courts and the Star Chamber – the inquisitorial method of putting the accused upon his oath and compelling him to answer questions designed to uncover uncharged offenses, without evidence from another source," *Doe v. United States*, 487 U.S. 201, 212 (1988), and it has circumscribed administrative power in favor of traditional Article III proceedings, *SEC v. Jarkesy*, 144 S. Ct. 2117, 2148-49, 2151-52 (2024); *Sackett v. EPA*, 566 U.S. 120, 130-31 (2012).

conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the [agency's] possession, and [4] that the administrative steps required by the [authorizing statute] have been followed." *United States v. Clark*, 573 U.S. 248, 250 (2014) (quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)). However, the "deferential attitude which courts usually apply to business related subpoena enforcement requests from agencies whose subject matter jurisdiction is unquestioned, has no place where political activity and association … form the subject matter being investigated." *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 387 (D.C. Cir. 1981).

In reviewing a CID, the court's role "is neither minor nor ministerial," and "federal courts stand guard … against abuses." *CFPB v. ACICS*, 854 F.3d 683, 688-89 (D.C. Cir. 2017). "Such an abuse would take place if the [CID] had been issued for an improper purpose, such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. A ruling enforcing or setting aside a CID is a dispositive matter and a final appealable order. *See Kemp v. Gay*, 947 F.2d 1493, 1497 (D.C. Cir. 1991).

## ARGUMENT

### I.   The CID is beyond DOJ's statutory authority, in whole or part.

#### A.   The False Claims Act does not authorize DOJ to issue a CID to revisit SBA's determination that CIS was eligible for a Second Draw PPP Loan.

At a fundamental level, the authority to issue a FCA CID is tied to the possibility of a violation of the FCA. *See* 31 U.S.C. § 3733(a)(1), (l)(2). DOJ could not, for example, issue a FCA CID to investigate whether someone vandalized a post office: there is no possible FCA claim, so there is no authority for an FCA CID.

Here, DOJ made clear it is investigating CIS's <u>eligibility</u> for a Second Draw loan, and DOJ's view is that "CIS was either eligible or it was not." St. John Decl. ¶¶ 9, 12, 13. DOJ confirmed as much

in its response to CIS's request for a meet-and-confer: "The United States Attorney's Office … issued a Civil Investigative Demand seeking information that would inform whether CIS was <u>eligible</u> for the Second Draw loan," and its "requests are plainly relevant to the current inquiry into CIS's <u>eligibility</u> for the Second Draw PPP loan." Exh. 17.

The problem is that the FCA doesn't authorize a CID to investigate CIS's "eligibility" for anything. The FCA "is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs. v. United States ex rel Escobar*, 579 U.S. 176, 194 (2016). Rather, it's SBA that Congress authorized to make regulations governing SBA loans; it's SBA that Congress authorized to issue Second Draw Loans; and it's SBA that Congress authorized to investigate violations of the Small Business Act and rules issued thereunder. 15 U.S.C. §§ 634(a)(6), 634(a)(11), 636(a)(37), 9012. SBA determined CIS was eligible, and SBA did so after CIS disclosed the facts that DOJ now purports to be investigating. Indeed, CIS asked SBA about its eligibility, and CIS specifically disclosed that it is a "think tank," that it is a "research organization … providing immigration policymakers … with reliable information," and that it conducts "research and publication of immigration issues." SBA had that information at the time it determined CIS was eligible for a Second Draw Loan, and—to CIS's knowledge—SBA has not reversed course. DOJ cannot use a CID to simply "cast about for potential wrongdoing" that "is outside the agency's jurisdiction." *CFPB v. ACIS*, 854 F.3d 683, 689 (D.C. Cir. 2017) (affirming order denying of enforcement). And where, as here, the CID facially touches on "the behavior of individuals and groups only insofar as they act, speak and associate for political purposes," heightened scrutiny is warranted. *FEC*, 655 F.2d at 387.

### B. DOJ cannot use an FCA CID where factual disclosures affirmatively defeat an FCA claim as a matter of law.

Even if DOJ could articulate a theory by which broad-stroke program eligibility could be actionable, *but see Escobar*, 579 U.S. at 194, FCA liability for what DOJ claims to be investigating is

affirmatively foreclosed. That's because "[i]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." *United States ex rel Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). "In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA" and "vitiate[s] a FCA action." *Id.* That's precisely what happened here: CIS disclosed it was a think tank and asked about its eligibility; a government agent literally wrote "take the money" in response; and CIS attached that exchange to its loan application, together with a request that SBA disregard the application if it determined CIS wasn't eligible.

This Court has repeatedly applied *Durcholz* to dismiss FCA claims where, as here, the relevant facts were disclosed to the government. In *United States ex rel Scott v. Pacific Architects & Engineers (PAE), Inc.*, 2020 U.S. Dist. LEXIS 6734, at *31-32 (D.D.C. Jan. 15, 2020), for example, Defendant PAE allegedly violated the FCA because it "purchased airline tickets that did not comply with the low-price requirements of the Fly America Act, and … requested government reimbursement for these overpriced flights…." An email incorporated in the complaint "instructed that unless a flight is going across the Atlantic Ocean, individual flights do not have to meet [Fly America Act] requirements," and stated that "that the instructions about how to buy flights in accordance with the Fly America Act came from a U.S. government official, Contracting Officer Representative Ted Kontek." Judge Kollar-Kotelly explained that "[w]hether Kontek was correct in his interpretation of the Fly America Act does not matter." What mattered is that "Kontek—as a representative of the U.S. government—told Defendant that it could purchase tickets in this manner." "Defendant's reliance upon the government's own explanation of the Fly America Act means that Relators' airline allegation fails because Defendant could not have 'knowingly' defrauded the government by following the government's directions."

14

Similarly, in *United States ex rel Gardner v. Vanda Pharmaceuticals, Inc.*, 2020 U.S. Dist. LEXIS 87790, *37-41 (D.D.C. May 19, 2020), Judge Mehta addressed the impact of a "prior authorization" system on otherwise unauthorized off-label drug prescriptions. He explained that courts have framed the effect of disclosure differently—some treat a disclosure as negating falsity, others treat it as negating knowledge or materiality—but they all agree on the result. "If a government payor knows that it is reimbursing for an off-label use, then an FCA claim cannot lie." Judge Mehta accordingly dismissed the FCA claim.

There is no reason to view the issue differently here, where CIS affirmatively disclosed it was a think tank, expressly made its application conditional on SBA's determining CIS is eligible, then supplied yet more detail about its research- and policy-related activities in a Form 990 provided in response to SBA's query. With those facts fully disclosed, SBA determined CIS was eligible. And *Durcholz*, *PAE*, and *Vanda Pharmaceuticals* hold that in the face of such disclosures, an FCA claim cannot lie as a matter of law. The same is true here, and DOJ cannot use a FCA CID to investigate known, indisputable facts that cannot be the basis of an FCA claim, but instead affirmatively defeat such a claim.

### C. DOJ's CID is inconsistent with the Lobbying Disclosure Act, raises First Amendment and Separation of Powers concerns, and is unduly burdensome

Much of the rest of the CID appears irrelevant to any legitimate FCA claim and designed solely to impose burden, all while implicating significant Constitutional concerns. Take Request Nos. 12 and 13, which seek "testimony … before Congress" and "regulatory comments," and Interrogatory No. 12, which similarly seeks information about "testimony in front of Congress … or any state legislature, or local legislature." The EAA declares that entities performing "lobbying activities" are ineligible for Second Draw Loans, and SBA defined that term by reference to section 3 of the Lobbying Disclosure Act of 1995, 2 U.S.C. § 1602. That provision defines "lobbying activities" as "lobbying contacts and efforts in support of such contacts," but the definition of "lobbying contacts"

specifically excludes "testimony given before a committee, subcommittee, or task force of the Congress" and communications "made in response to a notice in the Federal Register … soliciting communications from the public," as well as various public statements. It also limits "lobbying contacts" to contacts with specific <u>federal</u> officials. Put simply, nothing sought by those requests can constitute "lobbying activities" as defined by SBA. So even if DOJ were authorized to review CIS's eligibility—DOJ is not—the material sought is irrelevant vis-à-vis lobbying activities. In any event, testimony and regulatory comments are posted to and readily accessible on CIS's website, as DOJ undoubtedly knows given its repeated references to CIS's website to justify its investigation.[4] [5]

DOJ's demands for "contacts <u>with</u>" Congress and "communications <u>between</u> the Center [*sic*] … and Congress, including Congressional staff" are even more concerning. The Lobbying Disclosure Act specifically limits its coverage to "communication … <u>to</u>" certain Congressional and executive officials. 2 U.S.C. 1602(8)(A). It's unclear how communications *from* Congress or Congressional staff could constitute lobbying activity. Yet information requests *from* Congress are the vast majority of CIS's contacts and communications with Congress. Ostrye Decl. ¶¶ 20-23. Disclosing those communications would severely burden CIS's effectiveness as an organization. *Id.*

The CID as a whole implicates First Amendment concerns that require the Court to give far less deference and perform a far more exacting analysis as compared to an ordinary CID. *FEC*, 655 F.2d at 390. "Where the [agency] seeks judicial enforcement of a sweeping [CID] … which intrudes upon centrally important First Amendment and advocacy interests, and where the [agency's] assertion of jurisdiction to conduct the investigation rests solely upon a legal interpretation of a statute without any need for additional facts, then it is essential for a court to assure itself affirmatively that the investigation is within the subject matter jurisdiction of the [agency]…." *Id.* Doing so is all-the-more-

---

[4] https://cis.org/Testimony
[5] https://cis.org/Regulatory-Comments

important here, where DOJ's requests implicate the Speech and Debate Clause, *e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501-503 (1974); *United States v. Rayburn House Office Building*, 497 F.3d 654, 659-663 (D.C. Cir. 2007); *see also Judicial Watch, Inc. v. U.S.D.O.J.*, 391 F. Supp. 3d 43, 51-52 (D.D.C. 2019), and Separation of Powers by seeking communications that were intended to facilitate oversight of DOJ and other executive agencies.[6]

## II. The vastly overbroad CID should be set aside because it was issued for the improper purpose of motivating settlement and to satisfy political demands.

CIS did what it was supposed to do. It asked its bank about its eligibility for a Second Draw loan, and the bank responded by telling CIS that SBA would review its application. CIS then asked SBA about its eligibility, disclosed the relevant facts, and SBA determined that CIS was, in fact, eligible. That chain of events was brought to DOJ's attention, along with cases making clear that government knowledge vitiates an FCA claim. Exh. 16. Indeed, CIS repeatedly explained that it would be entitled to judgment on the pleadings on an FCA claim because CIS's disclosure would necessarily be incorporated into any complaint alleging a false certification. DOJ didn't dispute that. Instead, DOJ noted that judgment on the pleadings would only come after CIS was subject to a CID and an investigation, and DOJ continued to demand that CIS repay twice the amount of its loan. DOJ's false

---

[6] Perhaps DOJ will try to justify those requests by reference to the vague prohibition on "political activities." *But compare* 5 U.S.C. 7321 *et seq* (linking "political activities" to specific actions related to elections, candidates, and campaigns) and 5 C.F.R. 734.101 (defining "political activity" as "an activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group") *with Bode v. Kenner City*, 303 F. Supp. 3d 484, 504 (E.D. La. 2018) ("[T]he Charter Amendment fails to define what conduct or speech constitutes 'political activity,' rendering it both unconstitutionally vague and overly broad."); *Ilen v. Bartholomew Cnty. Court Servs. Dep't*, 185 F. Supp. 3d 1075, 1082, 1084 (S.D. Ind. 2016) (holding ban on "political activity" without further definition to be "unconstitutionally vague"). CIS can't be sure because DOJ moved the goal after its "think tank" theory ran aground on the disclosures in the loan application DOJ didn't bother to review, then refused to meet and confer about its CID. In any event, it's a legal question that is properly resolved in reviewing a CID, *see Clark*, 573 U.S. at 256, and it does not depend on any factual development. On that point, it would be absurd to construe a statute as Congress conditioning a benefit on recipients not providing information to Congress (via testimony) or executive agencies (via regulatory comments).

claims act investigator did so—after apparently consulting with more senior officials—pursuant to the "policy of [his] office" of seeking more than recoupment.

Such a "conscious decision by an agency to pursue a groundless allegation without hope of proving that allegation" is the very definition of the "bad faith" that renders a CID unenforceable. *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 & n.9 (3d Cir. 1981). The Court need not get to the question of enforceability, however, because DOJ's use of a massively overbroad CID—and the significant cost and disruption of responding to it—as pressure to extract a settlement is an improper purpose that warrants setting it aside. *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct.*, 482 U.S. 522, 546 (1987) (noting that "discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence"); *FTC v. Bisaro*, 2010 U.S. Dist. LEXIS 83741, at *15-16 (D.D.C. July 13, 2010) (granting discovery into CID: "Mr. Bisaro has made a colorable claim that the FTC may have exceeded its authority by using its investigative power to pressure Watson to enter into a business deal that the FTC considers desirable."). That DOJ is acting under pressure from Congress and the President reinforces that conclusion. 648 F.2d at 130. And that it was completely uninterested in documentary evidence of fraud by CIS's lender does, too. At a minimum, the inference of improper motive is plausible, such that inquiry into DOJ's motives is appropriate. *See Clark*, 573 U.S. at 254 ("The [recipient] need only make a showing of facts that give rise to a plausible inference of improper motive.").

## III.    The CIS is vastly overbroad and unduly burdensome.

Even if the CID is within DOJ's statutory authority and was not issued for an improper purpose, it is still vastly overbroad. For most administrative subpoenas, the required showing to set aside or modify the subpoena based on undue burden is that the subpoena "threatens to unduly disrupt or seriously hinder normal operations of a business." *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977). The FCA CID statute, however, provides that the Federal Rules of Civil Procedure

apply. 31 U.S.C. § 3733(j)(6). The typical scope of discovery, proportionality, and burden factors therefore apply. *See United States v. Carahsoft Tech. Corp.*, 2024 U.S. Dist. LEXIS 36375, at *3-4 (D. Md. Feb. 27, 2024); *see also Watts v. SEC*, .482 F.3d 501, 509 (D.C. Cir. 2007). And although DOJ's CID contemplates objections "at or before the date on which [CIS's] responses are due," out of an abundance of caution, CIS asserts certain burden objections here.[7]

  **1.**  Although the subpoena is nominally directed to CIS, "you," "your," "CIP," and the "Center" are defined as referring to "Center for International Policy." Each interrogatory and each document request other than Request Nos. 6, 7, and 8 accordingly seek documents related to an entity other than CIS. Those interrogatories and requests appear to be facially irrelevant to the stated alleged conduct and applicable law provision identified in the CID, such that those interrogatories and document requests should be set aside. 31 U.S.C. § 3733(a)(2)(A). In any event, after reasonable investigation, CIS does not believe it has responsive information or documents related to the Center for International Policy in its possession, custody, or control.

  **2.**  The CID defines the "time period" as "January 1, 2018, through the date the demand was served on you unless otherwise noted." The EAA, SBA's elaboration on the statutory text, and the certification at issue are all written in the present tense, such that the only relevant date is the date of the certification itself. Even if that were not true, First Amendment constraints require that the relevant time period cannot extend beyond the date of loan forgiveness. That's because Congress can set "conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize," but the First Amendment forbids "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Alliance for Open Society, Int'l, Inc. v. U.S.A.I.D.*, 570 U.S. 205, 214-16 (2013). Thus, for example, Congress could not condition participation in a spending program on a citizen yielding its First Amendment rights once it is no

---

[7] CIS reserves the right to assert additional objections or expand these objections.

longer receiving government funds. *See Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014). Here, the eligibility restriction relates to speech, such that the First Amendment plainly applies. Accordingly, after the Second Draw Loan was forgiven, *i.e.*, after September 27, 2022, CIS's activities were outside any Second Draw restriction and are not relevant.

**3.**     The CID as a whole is the proverbial "every document in your possession" discovery request. It seeks "all documents" on broad topics, including drafts, etc. The Supreme Court has explained that such "any and all" documents requests that "ask for everything under the sky" "are anything but appropriate." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 387, 388 (2004). That type of request is facially overbroad and unduly burdensome, and they were repeatedly held so even before proportionality was incorporated into the text of Rule 26. *See Donnell v. Arringdon Development, Inc.*, 2005 U.S. Dist. LEXIS 51766, at *4 (M.D.N.C. Nov. 8, 2005) (compiling cases). That the documents requested may be relevant does not save such overbroad requests. *In re: Exactech Polyethylene Orthopedic Products Liability Litigation*, MDL 2044, 2024 U.S. Dist. LEXIS 184064, at *25-30 (E.D.N.Y. Oct. 3, 2024) (reviewing cases and holding requests for "all" documents were "overly broad" and disproportionate despite seeking relevant documents). That's particularly true where, as here, the recipient is a small non-profit organization that will be unduly disrupted and be seriously hindered in its normal operations if required to comply with the CID, especially Interrogatory Nos. 10-12, and RFP Nos. 11, 14, 18, and 19, or required to provide documents in the electronic format requested. Ostrye Decl. ¶¶ 17-25; St. John Decl. ¶¶ 19-20.

**4.**     The vast overbreadth, disproportionality, and abusive nature of the CID is illustrated by DOJ's request for "all documents referring to the Center [*sic*] as a 'think tank.'" (RFP 19). CIS disclosed it is a "think tank" in the certification DOJ purports to be investigating. Unless DOJ contends CIS is <u>not</u> a think tank, such documents cannot be relevant to a false claim. With respect to the burden of that request, CIS's tagline is that it "is the nation's only think tank devoted exclusively

to research and policy analysis of the economic, social, demographic, fiscal, and other impacts of immigration on the United States." So the resulting hit count is high: as of October 23, 2024, a search of CIS's website for the phrase "think tank" returns 2,820 hits, all of which are equally accessible to DOJ—as DOJ has made clear in relying on CIS's website. St. John Decl. ¶¶ 19-20.

## **<u>CONCLUSION</u>**

For the foregoing reasons, DOJ's CID should be SET ASIDE pursuant to 31 U.S.C. § 3733(j)(2), and CIS should be awarded its costs and attorney fees to the extent provided by law.


Dated: October 23, 2024

Respectfully submitted

/s/ Earl N. "Trey" Mayfield, III
Earl N. "Trey" Mayfield, III, DCB # 459998
CHALMERS ADAMS BACKER & KAUFMAN, LLC
10521 Judicial Dr., #200
Fairfax, VA 22030
703-268-5600
tmayfield@chalmersadams.com


/s/ Joseph S. St. John
Joseph S. St. John*
ST. JOHN LLC
1701 Jefferson Avenue
New Orleans, LA 70115
Tel. 410-212-3475
scott@stjohnlaw.com

*Counsel for Petitioner Center for Immigration Studies*
*\* pro hac vice to follow*

## CERTIFICATE OF SERVICE

I, Joseph Scott St. John, am over the age of 18, and certify that I am causing a copy of the foregoing to be sent via certified United States mail, postage prepaid, addressed as follows, on Oct. 24, 2024:

Civil Process Clerk
Attn: Brian Hudak
U.S. Attorney's Office for the District of Columbia
601 D. Street, NW
Washington, DC 20530

Civil Process Clerk
Attn: Sean Tepe
U.S. Attorney's Office for the District of Columbia
601 D. Street, NW
Washington, DC 20530

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW Washington, DC 20530-0001

I further certify I am causing a copy of the foregoing to be sent via email to Sean.Tepe@usdoj.gov.

/s/ Joseph Scott St. John